I believe we're ready to start with the first case, Rosado v. Maxymillian. Good morning, your honors. May it please the court. I am Hannah Redmond of Bond, Shenick and King, appointed counsel for Appellant Richard Rosado. Mr. Rosado is an involuntarily civilly-confined resident of the Sex Offender Treatment Program in Marcy, New York. Mr. Rosado has been confined to the SOTP since 2008. Today we ask that this court reverse the district court's decision and order, which granted the state's motion for summary judgment, and allow Mr. Rosado's 14th Amendment due process and First Amendment access to court claims to proceed. I first want to address Mr. Rosado's substantive due process claims with respect to treatment, vocational training, Internet access, and the use of restraints. Focusing first on the issue of treatment, the district court erred in declining to address the threshold question as to whether Mr. Rosado has a substantive due process right to treatment in the first place. How is that an error? I mean, why did he, why was that a mistake to not address the substantive claim if he didn't have to? We submit that the district court did have to reach that claim, given that that was the question presented to it. That's the heart of Mr. Rosado's claims in this case, is the right to treatment. And based on this court's decision in Woe v. Cuomo, the state has, or the court, rather, has recognized that if the justification for confinement rests even in part on a need for care and treatment, as it does under New York's mental hygiene law, then a state which commits must also treat. Here, the state has subjected Mr. Rosado to involuntary confinement under Article 10 of New York's mental hygiene law for the purpose of treatment. The state has done so, having identified Mr. Rosado as an individual with a mental abnormality. That is the state's articulated justification for confining Mr. Rosado and depriving him of his liberty is so that it can provide him treatment for this mental abnormality. Having undertaken the goal to treat, the state can now claim that it has no obligation to provide such treatment. The Supreme Court has acknowledged that there's a massive curtailment of liberty associated with involuntary confinement. Here, Mr. Rosado's liberty has been confined in the most significant of ways. Having deprived Mr. Rosado of his liberty for the purpose of treatment, the state must provide treatment. The state created this obligation for itself, and it's this obligation that the Woe Court recognized to exist. I think I understand that argument. And let's assume for the moment that we agree with you, that there was a decision made in Woe v. Woe. I'm still coming back to the point with which you began. The district court assumed arguendo that there was a constitutional right, but said there's no showing of a violation here, given the professional judgment rule. And what was wrong with doing that? I mean, maybe that was an error, but procedurally, I don't see why that was impermissible for the district court to do. So first, we submit that the professional judgment standard should not have been used at the summary judgment stage, given the inherent questions of fact as to whether or not the state's decisions with respect to Mr. Rosado's confinement are actually the product of professional judgment. Those are inherently factual questions that should have been submitted to the trier of fact. And also, with respect to the procedural posture, we had an agreement, or we had written the court in advance asking to approach discovery in phases so that pro bono counsel did not incur the expense of obtaining an expert. And we have a text order from the court suggesting that we would be allowed to move to reopen discovery for expert disclosure on the issue of treatment. And then the court, as you identified, assumed without deciding that Mr. Rosado did have a right to treatment, only to fault him for failing to provide the expert discovery that we had sought in advance to put on hold pending resolution of that threshold issue. Did you seek relief from the district court at that point? Following the decision in order and summary judgment? Following decision. We did not move for, we did not make a motion for reconsideration. Chose to appeal instead. With respect to the treatment issue, the state relies primarily on this court's decisions in Cuomo 1 and 2. We submit that those cases are inapplicable and distinguishable for several reasons. First, the confinement at issue in Cuomo was voluntary. Here, Mr. Rosado is not a voluntary resident of the SOTP. He has involuntarily been confined for more than 13 years against his will. And secondly, and more importantly, the treatment at issue in Cuomo was not for the purpose of, or the confinement, rather, was not for the purpose of treatment. It was for the purpose of safekeeping. This alone distinguishes Mr. Claims from the Cuomo, Mr. Rosado's claims. I'm sorry, I missed what you just said. The mask's muffled, so a little slower. So the confinement at issue in Cuomo 1 and 2 was not for the purpose of treatment. Right. It was for the purpose of safekeeping. These were individuals with severe developmental disabilities, and whether they had a realistic opportunity for release was a question. And that fact alone, the purpose of the treatment and the resident population at issue is another reason that the Cuomo decisions are inapplicable to Mr. Rosado's case. But in Mr. Rosado's case, do I understand New York law correctly that involuntary commitment requires a finding of risk of harm? That's correct. And risk of harm to whom? I believe the public. The public. So to that extent, isn't there an analogy here? I mean, the circumstances would not be distinguishable. But help me out if I'm not understanding this accurately. So the question, I believe, is about the nature of the confinement. Mr. Rosado's liberty interests are greater because he's confined against his will, whereas the residents in Cuomo 1 and 2, they voluntarily or their families have committed them to these institutions, so there's a lesser loss of liberty. I understand. And the point I was asking about may really bear more on your black box claim. But OK, let me let you continue your argument. Thank you. Sure. The district court, as I stated previously, erred in using the professional judgment standard at the summary judgment stage. Youngberg does create a presumption of corruptness to which professional judgment is entitled. However, that is only a presumption. And as this court again recognized in Woe, the presumption is not conclusive, but can be overcome by showing that professional judgment was not, in fact, used. And here Mr. Rosado has raised a number of issues of fact as to whether or not SOTP officials, in fact, relied on their professional judgment in determining the conditions of his confinement. Instead of questioning whether professional judgment was used and submitting this to the trier of fact, the district court conclusively accepted the judgment of SOTP officials and granted for the State on summary judgment. With respect to the use of the vocational treatment for just vocational programs for just a moment, am I understanding your argument, the thing you point to there to say there's a problem with relying on what's in the record is a difference in treatment between your client and what inmates would receive in a prison facility? Correct. That's part of the claim. So we were relying on Youngberg's guidance on this point, which stated that the conditions of confinement for the civilly confined must be more considerate than for incarcerated prisoners in a prison setting. I'm just wondering about that argument, because I would have read that sentence to mean they need to be more considerate, meaning a punishment is out in the balancing test, right, that these people that are civilly committed are not being punished and that's not part of the State's interest in their treatment. But I wouldn't read that to mean that whatever a prison has in place, people in civil confinement must have that or better, because you've still got to balance needs of security and order and safety and treatment, which the State has an interest in, versus liberty interests. Absolutely. And I agree with you that not every condition in DOCS needs to be given to the State. We're not saying that it's an apples to apples comparison. However, where the issues, where the condition at issue is the use of restraints or speaks to the purpose for the confinement, there is a substantive due process right to have conditions of treatment that are at least as considerate as the conditions in DOCS. And to overcome that, to, where there's a disparity, the State has to show that it relied on professional judgment to justify the disparity. And here there are questions of fact as to whether or not the conditions of confinement were in fact the product of the SOTP official's professional judgment. Thank you. We'll hear from your adversary. Good morning, Your Honors. Beginning with the treatment claim, the question of the existence of a right to treatment on the contours of that right is an interesting question that has created varying opinions from the Circuit Courts of Appeals, but it's not a question that this Court need to address at this point. There's no issue here whether the State needs or needs to provide sex offender treatment, because the State has indisputably offered sex offender treatment to those civilly confined under Article 10. In addition, that treatment is intended to improve the condition of those who are in civil confinement with the goal of eventually— Can I just ask, just making sure I understand the state of the law, I understand your argument that we need not reach the question, but am I right that the majority of circuits to have considered it have found that civilly committed sex offenders do have a limited substantive due process right to treatment? That's correct, Your Honor. And if I may, we don't dispute that. We would agree that there is a right to some form of treatment. The only disagreement is what is meaningful under the Constitution. And so our position is that, yes, the State need offer sex offender treatment, but that treatment need not necessarily improve a condition. It only need to make sure that a person doesn't get worse. We derive this right from this Court's decision in the Cuomo 1 case from 1984. The operative language could be found on page 1250 of that opinion, and it reads, the due process clause only permits deprivations of liberty. Where statute does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution. It simply fails to grant the benefit of optimal treatment. It's our position— That language you just read to us suggests the treatment has to be aimed at improving the condition. And I thought a moment ago you said they only needed to prevent him from getting worse. So perhaps you need to clarify your point. If I can clarify, that language, Your Honor, is in support of a holding that the treatment need not improve the individual's condition. And we argue that that language would readily extend to any civil confinement context. Improvement is optimal. That would not be the due process floor. That goes above the due process floor. I raise this argument because if this Court were to agree, we would win the treatment case at the threshold level because the treatment we provide is indisputably designed to improve a condition. So it is already above the due process floor. Whether or not this Court— Is Cuomo distinguishable? I mean, it is about the mentally disabled. And it was in that context that the right to treatment is assessed. Does it make a difference that this is not a question of a person who's mentally disabled but a sex offender? No, Your Honor. We would argue that this standard would apply in any context for civil confinement based on a mental health condition. So it could be developmental disability. It could be mental illness. It could be mental abnormality as defined here. But the common vein through all of these is that there is an ascertainable condition and there is an ascertainable measure of progress. In this case, the progress would be control over one's sex offending behavior, something that under New York Mental Hygiene Law 10.09 is evaluated every year. So assume for a second that a person is fully engaging in their treatment program and we that they're actually regressing, that gives the Office of Mental Health an opportunity to course correct, to modify the mode of treatment, to put them back on track. But the fact that they might not make progress in a given year and are staying at the same level of dangerousness that they were would not give rise to a constitutional claim. That might give rise to something under—to a claim under state law. I wouldn't want to concede that one way or another. But of course, we do provide treatment that is aimed to improve someone's condition. Frankly, we are proud of the program that we offer. And throughout this litigation, we've defended the professional judgments that support it. In the declarations of Jeff Nowicki and Dr. Danielle Dill, we describe the program in detail, the evolution of the modalities we've used. We describe our strength-based approach, which in plain English just means that if a person is willing to treat some of their risk factors but not others, we focus on the strengths. And we discuss the progression through the stages of change that in actual practice results in release, as has happened to four of Mr. Rosado's co-defendants—co-plaintiffs here. That's why they're not in the case. They have been released because they've worked their way through the system. And importantly, Mr. Rosado has conceded in his declaration that the program operates as our witnesses have described, but that he doesn't engage in treatment. He provides several reasons, among them that he doesn't agree with using his treatment progress in court. And also in his deposition, he has declared that he doesn't believe he has a condition that warrants treatment in the first place. This was never going to overcome the presumption of correctness. This is not something that my adversaries dispute on this record. They claim that it's simply unfair that they weren't given a chance to build a record and call an expert. We would say that the record simply does not bear this out. As the plaintiff, Rosado was always going to not only need to establish a right to treatment but a violation of that right. And that means that he was going to need to overcome the presumption of correctness. He has represented that he believes the way to do that is by securing an expert. And to that effect, he had almost four years of discovery in which to do so. I understand that Mr. Rosado claims that he had assumed we would raise this threshold issue, but that's a purely legal question. If we wanted to raise it, we could have moved to dismiss under 12b-6. Now, I understand we could have also raised it in summary judgment, but it gets to the question of discovery. Discovery is to discover facts. It's not to discover questions of law. So that was the time to find an expert. Well, the argument seems to be that there was confusion about how the summary judgment motion would be litigated and that they were disadvantaged because they were trying to conserve cost by putting off the expert issue until the substantive issue had been decided, the merits issue. My response to that, Your Honor, is that that was simply bad strategy because they always needed to procure an expert if they believed that that was the way they were going to prevail. And if there was confusion, I would direct this Court's attention to docket number 161. That's our reply. We argued in earnest that they did not make their evidentiary showing. So at that point, Rosado was on notice that we were continuing to press this issue despite the order that he claims to be confusing. It's at that point that, at the very least, he should be going back to the district court and clarifying what is on the table right now. However, I want to point out that even if this Court finds the confusion to be sympathetic, at no point in this litigation has Rosado ever made a representation or proffer of what an expert would actually accomplish here. The presumption of correctness is a rigorous one. It's not enough that they could procure an expert to simply disagree with OMH's approach. The expert would need to show that it was so beyond the pale that it could not conceivably be supported by professional judgment. We don't even know if they have identified an expert, let alone that that expert has a theory that could reach this. So any kind of remand based on this inability to present the case is really a remand for them to first start searching for an expert. And after all this time, we would submit that it's too late to do that, and that would prejudice the defendants here who did submit their evidence within the deadlines. Moving on to the remaining due process claims, I would note that the presumption of correctness is appropriate for the summary judgment stage. The Woe case, on which Rosado relies, applied it at the summary judgment stage. And we would take issue with a reading of Youngberg that creates due process rights simply by comparing prison to civil confinement. That Youngberg did not create a dual track analysis. In fact, Youngberg can be read, and we would argue is most plausibly read, to read that if professional judgment was exercised, then the conditions of confinement are more considerate than those in prison, even if they are restrictive because they are not designed to punish. On that basis, we would argue twofold that there is no due process right to either vocational training or internet access. However, if this court were to disagree and find that it's even arguable there's such a right, our declarations expressly tie both vocational training and internet access to clinical considerations, and Mr. Rosado has not done anything that would overcome the presumption of correctness there. He simply disagrees and laid disagreement at that. We acknowledge that there is a right to be free from unnecessary restraints, but we have our security chief explaining why individuals, why Rosado falls in a group of individuals for whom the black box, which he disputes, is necessary. Rosado doesn't argue that he ever tried to seek a variance or that he is eligible for a variance based on his individual circumstances. He simply accuses the security staff of not substantially complying with OMH policy. Can you explain the security concern a little bit to me? I understand and your adversary acknowledged that the involuntary confinement is a result of a finding of risk of harm, but is it to the public from a risk of violence or is it a risk of repeat sexual offending? I understand why restraints would apply in the first circumstance and it's a little more questionable in the second. So the concern is the two that you've named are related to each other. So somebody who's adjudicated a dangerous sex offender requiring confinement, by statute that means that they pose an unreasonable risk of reoffending sexually. Recidivism, yes. And so for that purpose, they're committed to CNYPC. That commitment is potentially indefinite. That is potentially? Potentially indefinite. And given this concern, given that they have served their sentences, there's been determined to be a larger than usual risk of flight. These people might have very good reasons to try and escape when they're in court. And during these transports to and from court and medical appointments, it's been determined that to prevent them from trying to engage in these escape attempts, that they need to have these restraints. Why the black box as opposed to regular handcuffs, just so that I understand? So regular handcuffs, an individual can tamper with the locks and even if they don't pick the locks, even tampering with the handcuffs can hurt themselves. So the black box keeps them from doing so. So does New York use the black box for all people now? It doesn't use regular handcuffs in any circumstances? For the reasons you've just stated, I wasn't aware of that. Your Honor, I can't profess to be aware of that question either. What I know is that on this record, we have security concerns that have justified our use of the black box and that the legal standard would be that those securities, that what we are doing is so unreasonably related to security, so as to amount to punishment. And that's not something that Mr. Rosado has rebutted here. Well, if New York police officers and state troopers and whatever aren't using black boxes for the transportation of criminally charged defendants, would that cast any light on the reasonableness of your using them for the transportation of sex offenders? No, Your Honor, because there are literally hundreds of different crimes that one can commit, whereas everybody who is civilly confined under Article 10 has been adjudicated a dangerous sex offender based on repeat sex offending. Not only that, but I would add that those adjudications come recently because of the annual review process. So each order of confinement only lasts one year. So every year, if they are re-confined, it is tantamount to a recent finding that they are dangerous sex offenders requiring confinement. And the main concern of the use of the device is flight. Excuse me? The main concern is flight. Polite? That they will... Oh, flight, yes. Yes. Okay, thank you. Yes, Your Honor. And so the legal standard here is, is this reasonably enough related to flight that it would... that it doesn't amount to punishment? We have articulated a good faith reason for having this general practice. I would also add that at CNYPC, which has over 300 sex offenders, we are making many transports to court almost on a daily basis, sometimes multiple transports per day. It would be unworkable for every single transport to perform some sort of individualized assessment of this individual offender's circumstances. Plus, what court is he going to? Do we know that court enough that we feel comfortable using a lesser kind of restraint? This doesn't preclude an offender from making a request for some sort of lesser restraint, and that can be brought towards clinical staff, and if indicated, might result in something less than the black box. But this is our... Has it ever? My understanding is that it has for medical reasons. I see. Okay, thank you. Just a final point, which is the First Amendment claim. I understand that I'm over my time, and I believe my adversary didn't get to it. I just want to remind the Court that we oppose that as well, and on that, I will rest on the brief, unless there are any other questions. Thank you. Thank you. Your Honors, I'd like to address a few points. First, we articulate, again, that Cuomo is distinguishable for the reasons I stated previously. I'd also like to speak to Cuomo, which relied on Youngberg to the extent that it determined the level of care appropriate, and it found that a preservation of basic self-care skills is the standard in the context of individuals who had no realistic opportunity for release. The Will Court recognized this, and in interpreting Youngberg, the Will Court said, because the resident, Mr. Romeo, who was the plaintiff in the Youngberg decision, was so profoundly disabled that there was no realistic possibility of his ever leaving the institution, the Supreme Court addressed his right to training only to the extent necessary to protect his liberty interests and personal security and freedom from restraint. From this, it follows that this Court has already recognized that the level of treatment due to civility confined depends on the realistic opportunity for release, and here, Mr. Rosado, unlike the plaintiffs in Cuomo, in the Cuomo decisions and in Youngberg, does have a realistic opportunity for release, and he could lead a self-sufficient life if released. Second, the State highlighted that summary judgment was rejected in Woe. That is not necessarily accurate. The Second Circuit reversed, finding that issues of fact precluded summary judgment. And finally, with respect to restraints, if tampering is the true concern, and that's what justifies the use of the black box, the nature of the crime shouldn't matter, and all detainees, whether civilly or criminally confined, should be subject to the same standards, but that's not what we have. We have evidence in the record that the black box is not used in docks, and it is used at the SOTP, and that disparity creates issues of fact as to whether Mr. Rosado's due process rights have been violated. Did Mr. Rosado put in evidence, I'm just trying to remember the record, that he was not subject to the black box when in penal confinement? That's correct. Finally, I do want to address this very briefly. I see that I'm out of time as well. The First Amendment access to courts claims, the district court found that the adequacy of the legal reference materials available at SOTP were inadequate. He said there was conclusive proof to reach that determination, and he dismissed Mr. Rosado's claims, finding that there was no actual injury. We submit that was an error, and that there were issues. Given the finding of inadequacy with respect to the legal research materials available, there was an issue of fact as to whether Mr. Rosado did have a non-frivolous claim that was impeded as a result of the inadequate materials. If there are no further questions, we'll rest on our briefs. Thank you both. Nicely argued.